IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **Mark. S.,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No. 7:17-cv-312** |
| ) | |
| **v.** ) | |
| ) | **By: Hon. Robert S. Ballou** |
| **NANCY A. BERRYHILL,** ) | **United States Magistrate Judge** |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

Plaintiff Mark S. ("Mark") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that he was not disabled and therefore not eligible for supplemental security income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 1381–1383f. Specifically, Mark alleges that substantial evidence does not support the residual functional capacity ("RFC") as determined by the administrative law judge ("ALJ") and that the ALJ improperly concluded that his subjective allegations were inconsistent with the objective medical evidence. I conclude that substantial evidence supports the Commissioner's decision on all grounds. Accordingly, I **RECOMMEND DENYING** Mark's Motion for Summary Judgment (Dkt. 14), and **GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 16).

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Mark failed to demonstrate that he was disabled

1

under the Act.[1] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Mark previously filed for SSI and was determined to be not disabled by ALJ Jeffrey A. Schueler on April 24, 2013. R. 54–62. ALJ Schueler found that Mark could perform a full range of work subject to limitations imposed by his left eye blindness and seizure disorder. R. 57.

Mark protectively filed a second time for SSI on May 2, 2014, claiming that his disability began on April 25, 2013. R. 171. The Commissioner denied the application at the initial and reconsideration levels of administrative review. R. 77, 90. On May 17, 2016, ALJ Schueler held an administrative hearing to consider Mark's disability claim. R. 25–50. Mark was represented by an attorney at the hearing, which included testimony from Mark and vocational expert John Newman. Id.

On June 29, 2016, the ALJ entered his decision analyzing Mark's claim under the familiar five-step process,[2] and denying Mark's claim for disability. R. 10–20. The ALJ found

---

[1] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[2] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform

2

that Mark suffered from the severe impairments of a seizure disorder and left eye retinal detachment. R. 12. The ALJ determined that Mark retained the RFC to perform a full range of work with the following restrictions: Mark (1) can never climb ladders, ropes, or scaffolds; (2) can occasionally balance; (3) can frequently stoop, kneel, crouch, crawl, and climb ramps or stairs; (4) should avoid even moderate exposure to hazards; and (5) can only work jobs that can be performed with monocular vision and allow one absence per month. R. 14. The ALJ determined that while Mark cannot return to his old job as an electrician, he can work jobs that exist in substantial numbers in the national economy such as cashier, fast food worker, and sorter/inspector/tester. R. 18–19. Thus, the ALJ concluded that Mark was not disabled. R. 20.

Mark appealed the ALJ's decision to the Appeals Council, but his request for review was denied. R. 1–3. This appeal followed.

## ANALYSIS

Mark argues that substantial evidence does not support the RFC and that the ALJ improperly determined that his subjective allegations were inconsistent with the medical evidence.

**Medical History Prior to the Relevant Period**

The opinion entered by ALJ Schueler sets out in detail Mark's medical history from August 2009 through November 2012, which is prior to the relevant period in this claim. Nevertheless, it provides an understanding of Mark's condition prior to the claimed date of onset.

---

other work. Heckler v. Campbell, 461 U.S. 458, 460–62 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

In August 2009, Mark saw Allan Philp, Jr., M.D., for a recent seizure. R. 58. Dr. Philp diagnosed a seizure and alcohol abuse. Id. At a follow-up appointment the next day, Michael P. Duncombe, M.D., explained that alcohol contributed to Mark's seizures. Id. Dr. Duncombe counseled Mark to stop drinking. Id.

In November 2009, Mark suffered another seizure. Id. Terrence D. Morton, Jr., M.D., diagnosed a seizure precipitated by alcohol abuse. Id. Mark had a normal physical and mental examination. Id. The examination showed that Mark was alert, oriented, had intact nerves, fluent speech, good motion of all extremities, and a cooperative attitude. Id. Dr. Morton prescribed seizure medications and instructed Mark to stop drinking. Id.

Mark had another seizure in December 2009. R. 59. Mark M. Taylor, M.D., noted that Mark had a total of seven seizures and was recently given a prescription for the seizure medication Dilantin, which he was not taking regularly. Id. The physical and mental examinations were normal. Id. Dr. Taylor restarted Mark on seizure medication and counseled him to stop drinking alcohol, as he indicated that it exacerbated Mark's seizures. Id.

In November 2010, Mark reported blurred vision in his left eye to Jonathan Till, M.D. Id. Dr. Till explained that Mark's left eye retinal detachment was getting worse and referred him to an ophthalmologist. Id.

In December 2010, Mark saw ophthalmologist Brian Conway, M.D., who placed an encircling buckle on Mark's left eye. Id. Later that month, Mark underwent a "left eye 20-gauge pars plana vitrectomy, pars plana lensectomy, C3F8 gas injection, and laser." Id.

In April 2011, state agency medical consultant Richard Surrosco, M.D., rendered an opinion for Mark's first SSI claim at the initial level of administrative review. Id. Dr. Surrosco explained that Mark had the RFC to perform work at all levels of exertion. Id. Dr. Surrosco noted

4

that Mark has certain postural, environmental, and visual limitations, including "left eye near/far acuity, depth perception, accommodation, and color and field of vision." Id. Michael Hartman, M.D., concurred with Dr. Surrosco's findings at the reconsideration level of administrative review. Id.

In May 2011, Mark returned to Dr. Conway after multiple procedures for his left eye retinal detachment. Id. Dr. Conway explained that the left eye minimally decreased in contraction, and explained that the contraction process was slowly improving. Id.

In November 2012, Lawrence S. Schaffzin, M.D., answered a medical interrogatory in the first disability claim diagnosing Mark with left eye blindness and retinal detachment. Id. Dr. Schaffzin stated that Mark should never climb ladders, ropes, or scaffolds; has limitations with depth perception and field of vision; and should avoid concentrated exposure to hazards such as heights and heavy machinery. Id.

**Medical History During the Relevant Period**

Mark's medical history is limited during the relevant period. Mark saw John K. Evett, M.D., in April 2014 for seizures. R. 233–37. Mark reported amnesia and tongue biting, but denied disorientation, fever, headache, vomiting, and weakness. R. 233. Dr. Evett stated that Mark has retinal detachment and a known seizure disorder, but he was noncompliant with his prescription seizure medication. R. 233–24. Dr. Evett noted that Mark consumes alcohol and tobacco. Id. Mental and physical examinations returned normal findings, and an EKG returned unremarkable findings. R. 235–36.

Mark saw Jeff Shelton, O.D., in May 2014 for an eye exam. R. 228. Dr. Shelton prescribed corrective glasses. R. 229.

Mark saw Thomas Parrish, M.D., in June 2014 for a recent seizure. R. 244. Dr. Parrish explained that Mark had not taken his seizure medication for one month. Id. Dr. Parrish stated that Mark has no regular doctor and could not recall the name of his previous doctor. Id. Dr. Parrish noted that Mark abuses alcohol, cocaine, tobacco, and marijuana. R. 244–45. Physical and mental examinations revealed normal findings, and an EKG returned unremarkable findings. R. 245, 248. Dr. Parrish explained that Mark initially would not take seizure medication, but eventually agreed to take it. R. 248. Dr. Parrish wrote Mark a prescription for seizure medication and counseled him to obtain a primary care physician to monitor his medication. Id.

Mark saw Ruthie Peevey, FNP, in October 2014 to obtain a primary care physician. R. 262. Nurse Peevey explained that Mark had never had a primary care physician and had never been evaluated by a neurologist. Id. Mark's physical and mental examinations returned normal findings. R. 263. Nurse Peevey refilled Mark's seizure prescription, simultaneously noting that he had not been taking it as directed. Id. Nurse Peevey recommended that Mark quit smoking, slowly taper off his alcohol consumption, eat healthier, and exercise. R. 264.

Mark followed up with Nurse Peevey in December 2014, reporting no recent seizures. R. 297. Nurse Peevey found no irregularities upon mental and physical examination besides pain stemming from an ATV accident two-and-a-half weeks prior. R. 297–98.

On July 8, 2015, Mark went to the emergency room after suffering a seizure. R. 307. Mark fell over from the seizure, causing injuries to his face and teeth. Id. Dr. Janet Young explained that Mark was postictal immediately after the seizure, but was soon alert and oriented, cooperative, speaking normally, and in a normal mood. R. 308–09. An EKG showed a recent seizure, but a CT scan was "essentially unremarkable." R. 309. Dr. Young discharged Mark shortly thereafter. R. 314.

Mark followed up with Nurse Peevey five days after the July 8, 2015 seizure. R. 304. Nurse Peevey reported that Mark felt well, and physical and mental examinations showed normal findings. Id. Nurse Peevey explained that before July 8, 2015, Mark had not had a seizure since June 2014. Id. Nurse Peevey increased Mark's seizure medication on July 8, 2015 after testing revealed that his Dilantin levels were low. R. 305. Nurse Peevey referred Mark to a neurologist. Id.

Mark returned to Dr. Shelton in May 2016. R. 322. Dr. Shelton explained that Mark's left eye is "hand motion vision only and cannot be improved." Id. Dr. Shelton diagnosed Lattice degeneration inferiorly in Mark's right eye, but explained that Mark "needs to see a Retinal Specialist to confirm that his eye health in the right eye is stable." Id.

**Substantial Evidence**

Mark challenges the RFC because the ALJ "never made specific findings regarding whether [his] seizure disorder would cause him to experience seizures necessitating breaks or absences from work and how often these would occur." Dkt. 15, at 6.

The RFC adequately accounted for Mark's concerns about his potential absences from work. The record confirms that Mark suffered three seizures in a fifteen-month period from April 2014 to July 2015. However, Mark does not point to any objective medical evidence to substantiate his testimony that each seizure resulted in a postictal period of three to four days, which would prohibit him from maintaining substantial gainful employment due to excessive absences. Dkt. 15, at 5; R. 32, 35–36.

Mark suffered three seizures during the relevant period: from April 2014 to July 2015. Mark recovered from each seizure, experiencing postictal complications for a short period before regaining normal physical and mental functioning. R. 233–37, 244–45, 308–09. Mark's doctors

explained that prior to October 2014, Mark was noncompliant with his seizure medication. Once Mark started taking seizure medication regularly in October 2014, he did not have another seizure for ten months. After the July 2015 seizure, Nurse Peevey increased Mark's seizure medication to further reduce the chance of another seizure. Thus, the ALJ accommodated Mark's risk of seizures in the RFC by restricting him to jobs that "permit him to be absent one day each month," which is more restrictive than the RFC in the previous claim for disability. R. 14, 18.

The RFC is quite similar to, but more restrictive than, the RFC from Mark's first claim for disability in which the ALJ found that Mark could perform a full range of work but he "could never climb ladders, ropes, or scaffolds, could frequently climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, and should avoid exposure to moving machinery or heights." R. 18. The ALJ also limited Mark to occupations that did not require left eye vision. Id. The only differences between the two RFC's are that Mark is now restricted to balancing occasionally, not frequently, and can only work in occupations that allow him to be absent once a month. R. 14, 18. The ALJ gave significant weight to the previous RFC, explaining that Mark's "condition has not progressively worsened since the last decision." R. 18.

The ALJ included additional limitations in the RFC to accommodate for Mark's retinal detachment and seizure disorder. Id. Mark points to no evidence that his condition has changed significantly since the ALJ's April 2013 opinion in Mark's first disability application. The ALJ may assign weight to the prior administrative decision. See Albright v. Comm'r of Soc. Sec. Admin., 174 F.3d 473 (4th Cir. 1999) (holding that the denial of a claimant's benefits based solely on a denial from an earlier time period is improper, and explaining that as the time period between the filing of the two claims increases, so do the odds that the claimant's condition has changed); Wheeler v. Colvin, No. 6:14-CV-34, 2016 WL 915301, at *7 (W.D. Va. Mar. 7, 2016)

8

(explaining that an ALJ should give greater weight to a previous administrative finding when that period is close in time to the period being adjudicated). Here, I find that substantial evidence supports the ALJ's decision to assign significant weight to the prior RFC.

The RFC in the present case is consistent with the opinions of the state agency physicians. In October 2014, Josephine Cader, M.D., explained that Mark had no limitations balancing, kneeling, crawling, crouching, stooping, and climbing ramps and stairs; could never climb ladders, ropes, or scaffolds; must avoid concentrated exposure to hazards such as machinery and heights; and must avoid work requiring good left eye vision. R. 72. In December 2014, on reconsideration, Gene Godwin, M.D., concurred with Dr. Cader's findings, except he further limited Mark to occasional balancing and avoiding even moderate exposure to hazards. R. 87. The ALJ gave significant weight to these opinions. R. 17. The ALJ explained that the opinions of Drs. Cader and Godwin were consistent with the objective medical evidence of record, and he subsequently relied on them in formulating Mark's RFC. Id.

The ALJ has a duty of explanation, the fulfillment of which does not require the ALJ to recite every piece of evidence in the record. See Piney Mountain Coal Co. v. Mays, 176 F.3d 753, 762 n.10 (4th Cir. 1999) ("If a reviewing court can discern 'what the ALJ did and why he did it,' the duty of explanation is satisfied.") (quoting Lane Hollow Coal Co. v. Dir., Office of Workers' Comp. Programs, 137 F.3d 799, 803 (4th Cir. 1998)). All that is required is that the ALJ explain the findings in the decision such that a reviewing court is able to conduct meaningful judicial review. See Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion") (quoting (Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)); DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983) ("Judicial review of an administrative decision is

9

impossible without an adequate explanation of that decision by the [Commissioner]. . . . The [Commissioner] must present [the court] with findings and determinations sufficiently articulated to permit meaningful judicial review.").

In crafting Mark's RFC, the ALJ discussed the objective medical evidence in detail, the opinions of the state agency physicians, Mark's previous work history and testimony at the administrative hearing, and the ALJ's previous decision. The ALJ gave a clear explanation of the basis for the RFC and did not omit any relevant evidence. See Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). Because I am not left to guess about how the ALJ arrived at his conclusions, I find that the ALJ's RFC determination is supported by substantial evidence.

**Consistency of Mark's Subjective Allegations**

Mark argues that the ALJ erred in finding that his subjective allegations were inconsistent with the record, as "[t]he medical evidence of record fully supports [his] allegations of debilitating symptoms." Dkt. 15, at 7.

In March 2016, the Social Security Administration superseded its policy on assessing the credibility of a claimant's statements (SSR 96-7p), and ruled that "credibility" is not appropriate terminology to be used in determining benefits. See SSR 16-3p. "[W]e are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term." SSR 16-3p, at *1. "In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character." Id. Thus, under SSR 16-3p, the ALJ is no longer tasked with making an overarching credibility determination and instead must assess whether the claimant's subjective symptom statements are consistent with the record as a whole. However, "although SSR 16-3p eliminates the assessment of credibility, it still requires assessment of most

10

of the same factors to be considered under SSR 96-7p." Kim v. Comm'r, Soc. Sec. Admin., No. 9:16-0823-BM, 2017 WL 2912414, at *4 n.10 (D.S.C. July 7, 2017).

The ALJ determines the facts and resolves inconsistencies between a claimant's alleged impairments and the ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). A claimant's subjective allegations of disabling symptoms and impairments are not conclusive on their own; rather, subjective complaints and statements of symptoms, like all other evidence of disability, are considered in the context of the record as a whole. See 20 C.F.R. § 404.1529. If a claimant's statements are inconsistent with other evidence, the ALJ may find that the claimant's statements are overall outweighed by that other evidence after weighing both accordingly. See SSR 16-3p.

In evaluating the consistency of Mark's subjective allegations, the ALJ fully discussed his medical history, his testimony, his work history, and the opinions of the state agency physicians. Mark worked inconsistently during the relevant period, which the ALJ found significant. R. 15. The ALJ explained that Mark worked as recently as July 2015, and even utilized ladders to perform electrical work. Id. Evidence of work during the relevant period is a legitimate factor the ALJ may consider when determining the consistency of a claimant's subjective allegations of debility. See 20 C.F.R. § 416.971.

The ALJ explained that Mark's testimony at the hearing was inconsistent with the medical evidence. Mark testified that after a seizure, he experiences chronic fatigue, soreness, confusion, and headaches for three to four days. R. 33–36. However, Mark denied confusion, headaches, weakness, and disorientation to his physicians after his seizures. R. 233; but see R. 307 (Mark reported suffering from a headache after his July 2015 seizure, but the seizure caused him to fall and hit his head on concrete). Mark's mental and physical examinations were

11

consistently normal throughout the relevant period, as he was found to be alert and oriented, cooperative, speaking normally, and in a normal mood. Additionally, Mark's EKG tests and CT scans were consistently unremarkable.

The ALJ explained that the objective medical evidence indicates that Mark's treatment for his seizure disorder and left eye retinal detachment were conservative. Indeed, the record reflects that Mark took prescription medication for his seizure disorder and wore prescription glasses for his retinal detachment. The ALJ explained that this treatment is not "the type[] of medical treatment one would expect for a totally disabled individual." R. 18.

I must give great weight to the ALJ's assessment of the consistency of a claimant's subjective allegations with the record and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). I find that the ALJ's determination of the consistency of Mark's statements regarding the severity of his symptoms in light of the objective medical evidence is supported by substantial evidence.

## CONCLUSION

It is not the province of the court to make a disability determination. The court's role is limited to determining whether the Commissioner's decision is supported by substantial evidence, and in this case, substantial evidence supports the ALJ's opinion. The ALJ properly considered all of the objective and subjective evidence in adjudicating Mark's claim for benefits and in determining that his physical and mental impairments would not significantly limit his ability to do basic work activities. Accordingly, I recommend that the Commissioner's decision be affirmed, the defendant's motion for summary judgment be **GRANTED**, and Mark's motion for summary judgment be **DENIED**.

The Clerk is directed to transmit the record in this case to Michael F. Urbanksi, Chief United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

Enter: July 5, 2018

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge